**FEDERAL KEMPER INSURANCE COMPANY, Plaintiff,**

v.

**Daniel C. JONES, et al., Defendants.**

**No. 90–CV–1228.**

United States District Court,
M.D. Pennsylvania.

Nov. 14, 1991.

Karen S. Cooney, Metzger, Wickersham, Knauss & Erb, Harrisburg, Pa., for plaintiff.

David Keeffe, Sayre, Pa., for defendant Daniel C. Jones.

Pamela L. Shipman, Roesgen & Larrabee, Williamsport, Pa., for defendant Frederick E. Hanes and Frederick Hanes d/b/a Blue Spruce Farms.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND

Federal Kemper Insurance Company ("Federal Kemper") filed this declaratory judgment action [1] against Frederick Hanes, individually and t/a Blue Spruce Farms, and Daniel Jones to ascertain its obligations under a comprehensive general liability policy issued to Hanes.[2] Jones was

---

1. 28 U.S.C. §§ 2201 *et seq.*

2. The named insured is "Blue Spruce Farms, d/b/a Frederick Hanes. For the sake of brevi-

injured in a November 25, 1985 farm accident when a modified tractor-trailer dump truck tipped and fell on him during an unloading operation. Jones filed a state court action against Hanes, and others, alleging strict liability, negligence and breach of warranty.[3] Jones alleges that Hanes modified the truck in a manner which made it unsafe. As Hanes' insurer, Federal Kemper denies any obligation to defend or indemnify him in the state court action under policy exclusions which negate coverage for injuries arising from completed operations or product hazards or from work performed by independent contractors. Federal Kemper bases its denial of coverage on the following undisputed facts.[4]

Hanes had the truck modified when he purchased it in 1979. The work, which consisted of lengthening the frame and installing an engine, was performed by the seller, Peffer Trucks, before Hanes took delivery. Hanes gave Peffer specifications, such as the dimensions of the body he intended to place on the frame and the weight of the gross load, but did not oversee the work and was not present when it was done. Immediately after Peffer's work was completed, the truck was inspected and then taken to Hostetler's Body Shop, where a dump-hoisted grain body was installed. Again, Hanes did not oversee the work, but did discuss his requirements, such as the capacity of the hoist, with Hostetler. Following completion of Hostetler's modifications, Hanes did not make any further modifications to the truck and used it on his farm [5] for three or four years without incident. When he no longer had use for it, he sold it as used equipment. It was subsequently purchased by Jones' employer, Clark Trucking Company, at an auction in 1983. (Record document no. 22, filed April 1, 1991, paras. 10–24; record document no. 28, filed April 30, 1991; and record document no. 27, filed April 30, 1991, pp. 3–4)

Based on these facts, which are undisputed, and on the provisions of the policy, Federal Kemper has filed a motion (record document no. 22, filed April 1, 1991) for summary judgment. For the reasons which follow, we find that the policy exclusion negating coverage for work performed by independent contractors applies and that Federal Kemper is not obligated to defend or indemnify Hanes in the state court action. Its motion for summary judgment will therefore be granted.

ty, we will refer to the insured simply as "Hanes".

3. *Jones vs. Hanes,* Civil No. 87–0048 (Bradford Co., Pa.1987). Federal Kemper is defending Hanes in the underlying action subject to a reservation of rights.

4. It is undisputed that the initial policy was modified by two endorsements, which took effect August 5, 1980, and expanded coverage to include farming and custom farming operations. (Endorsement Nos. GL 2211 and G603). There were no further substantive changes in the policy until November, 1982. At that time, a new declarations page was issued along with an annual renewal policy, which was essentially a continuation of the initial policy issued in 1979 as modified by the 1980 change endorsements.

Custom farming coverage was subsequently deleted in March, 1983. In December, 1984, coverage for the hay, grain, and feed operations was likewise deleted, leaving only the farm coverage in effect at the time of the accident. (Record document no. 22, filed April 1, 1991, paras. 42–48).

All of the foregoing facts are undisputed. (Record document no. 28, filed April 30, 1991, paras. 42–48). There is a dispute, however, as to whether Hanes had completed operations coverage at the time of the accident. It is Federal Kemper's position that:

The ... policy ... in effect from December 14, 1984 through December 14, 1985 contained a completed operations and product hazard exclusion and such exclusions were part of the policy since the time is [sic] was originally issued in 1979.

(Record document no. 22, filed April 1, 1991, para. 49). Defendants dispute this statement. It is their position that the farm endorsement (GL 2211) issued in 1980 included completed operations coverage, and that such coverage remained in effect through the date of Jones' accident. (Record document no. 28, filed April 30, 1991, para. 49, citing Franklin deposition, Exhibit "5", p. 52 and Exhibit "5", pp. 71–72 and deposition Exhibits 14 and 15.

5. Hanes used the truck in farming operations he conducted on his own land as well as in custom farming and grain hauling services he established. "Custom farming" refers to the practice of harvesting crops grown by other farmers. (Record document no. 22, filed April 1, 1991, para. 9)

**408**

## DISCUSSION

### A. *Motion for summary judgment standard*

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*" Fed. R.Civ.P. 56(c) (Emphasis supplied).

> ... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, an on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra* at 323 and 325, 106 S.Ct. at 2552–53 and 2553–54.

Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *Anderson, supra,* 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3d Cir.1988).

### B. *Pennsylvania insurance law*

Interpretation of the policy and resolution of the question of Federal Kemper's duty to defend and indemnify are governed by Pennsylvania insurance law.[6] The presumptions which apply depend upon whether the policy language at issue is ambiguous or unambiguous. In deciding this question, courts should read the policy with an eye toward avoiding ambiguities and take care not to torture policy language to create uncertainties where none exist. *Northbrook Insurance Co. v. Kuljian Corp.,* 690 F.2d 368, 372 (3d Cir.1982), (applying Pennsylvania law).

Policy language is ambiguous if reasonable persons could honestly differ as to its meaning, i.e. if it is susceptible of more than one meaning. If found to be ambiguous, the ambiguities are to be resolved in favor of the insured and in a manner consistent with his reasonable expectations when he contracted for coverage. This precludes insurers from insulating themselves from their contractual obligations by inserting "overly-subtle or technical interpretations" in an unfair attempt to defeat the reasonable expectations of

---

6. Choice-of-law decisions are governed by the choice-of-law rules of the forum state. *Klaxon v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

 In this instance, Pennsylvania choice-of-law rules require application of Pennsylvania law. All of the events took place in Pennsylvania. The policy was issued here, Hanes' farming operations were conducted here, the truck was purchased and modified here, and Jones' accident occurred here. No other state has any contact with the events giving rise to either this action or the state court action. *Griffith v. United Air Lines,* 416 Pa. 1, 203 A.2d 796 (1964). Moreover, both sides agree that Pennsylvania law applies.

the insured. *Harford Mutual Insurance Co. v. Moorhead,* 396 Pa.Super. 234, 578 A.2d 492, 495 (1990),[7] *alloc. denied,* 527 Pa. 617, 590 A.2d 757 (1991). This rule favoring the insured applies even if the insured is a commercial or business entity, and therefore, presumably knowledgeable about contracts and their legal implications. *Acands, Inc. v. Aetna Casualty and Surety Co.,* 764 F.2d 968, 973 (3d Cir.1985).

 On the other hand, if policy language is found to be unambiguous, these presumptions do not come into play. *Imperial Casualty & Indemnity Co. v. High Concrete Structures, Inc.,* 858 F.2d 128 (3d Cir.1988) (applying Pennsylvania law). The law gives effect to the plain language of the policy as written. *Harford, supra,* 578 A.2d at 495. In keeping with that principle, plainly-worded coverage exclusions are given effect so long as they are conspicuously displayed. There is no concomitant requirement that the insured have read or understood such exclusions. *Pacific Indemnity Co. v. Linn,* 766 F.2d 754, 761 (3d Cir.1985) and *Berne v. Aetna Insurance Co.,* 604 F.Supp. 958, 960–61 (D.V.I.1985), *aff'd per curiam,* 782 F.2d 1026 (3d Cir. 1985). Policy language which is otherwise clear is not rendered ambiguous because it requires the insured to read thoroughly and carefully to grasp the coverage received. *Viger v. Commercial Insurance Company of Newark, New Jersey,* 707 F.2d 769, 774 (3d Cir.1983).

 Linked to policy interpretation on the question of coverage is the deriva-tive question of the duty to defend and indemnify the insured. The insurer is obligated to defend an action filed against its insured if the allegations may potentially come within policy coverage unless and until the insurer can confine the claim to a recovery outside the bounds of coverage. *Imperial Casualty, supra,* 858 F.2d at 131–32; *Harford, supra,* 578 A.2d at 494. Any doubts regarding the insurer's duty to defend must be resolved in favor of the insured. *American Contract Bridge v. Nationwide Mutual Fire Insurance,* 752 F.2d 71, 76 (3d Cir.1985) and *D'Auria v. Zurich Insurance Company,* 352 Pa.Super. 231, 507 A.2d 857 (1986).

*Independent contractors' exclusion*

 The independent contractor exclusion in the Federal Kemper policy excludes coverage for injuries which arise out of "operations performed for the named insured by independent contractors or acts or omissions of the named insured in connection with his general supervision of such operations", with two exceptions not relevant here. The policy language is clear, and Hanes does not contend otherwise. Nor does he contend that the work performed at his behest by Peffer's and Hostetler's was done under his direct supervision.

Although Hanes did not admit in response to plaintiff's statement of undisputed facts that Peffer and Hostetler acted as independent contractors, he alleges that to be the case in his answer to Jones' complaint in the state court action.[8] Hanes'

---

**7.** In diversity cases, the District Court is bound to follow the substantive law of the state in which the Court sits. *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Therefore this court is bound by the decisions of the Supreme Court of Pennsylvania. In the absence of an authoritative pronouncement from the highest court, District Courts are obliged to give due regard to the decisions of the forum state's intermediate appellate court as an indicia of how the state's highest court would decide the issue. *Connecticut Mutual Life Insurance Co. v. Wyman,* 718 F.2d 63, 66 (3d Cir. 1985) and *Ciccarelli v. Carey Canadian Mines, Ltd.,* 757 F.2d 548, 553 (3d Cir.1985).

**8.** In his answer to Jones' complaint filed in the state court action, Hanes avers that the truck was "modified by independent contractors who lengthened the frame, installed tandem axles on the lengthened frame, and installed a drive shaft and a knapheidie dump hoist and grain body." (Record Document No. 21, filed April 1, 1991, Exhibit "B", para. 17) This averment is consistent with a statement Hanes gave in connection with this action. In response to questioning, Hanes stated:

Q. Okay, as far as when you bought this unit, was it ever discussed what your purpose of using the unit, what you were going to use the unit for?
A. Yes we made those arrangements at the time it was purchased, Jay [Peffer] was going to lengthen the frame for me, in fact, it was

admission in the underlying action precludes him from taking a different position in this action, and he does not seriously contest that issue, but takes a different tack in arguing that the exclusion does not apply.

Hanes argues that coverage exists because Jones' allegations can be construed as directed not only to the manner in which the modifications were made, but also to Hanes' own actions in hiring the contractors. As support for this argument, Hanes relies on Jones' allegation that Hanes was negligent in failing to consult "competent people to determine or otherwise insure" that the modified vehicle would be safe for its intended use.[9]

The Federal Kemper policy excludes coverage for injuries caused by acts or omissions of independent contractors as well as alleged acts or omissions of the named insured "in connection with his general supervision of such operations". This language brings Jones' allegations within the bounds of the exclusion, regardless of whether the culpable conduct is alleged to be acts of independent contractors or Hanes' own alleged negligence in failing to exercise proper supervision.

Moreover, the courts have rejected similar arguments attempting to differentiate between the results of the insured's conduct and the conduct allegedly responsible for such results. In *St. Paul Surplus Lines Insurance Co. v. 1401 Dixon's, Inc.,* 582 F.Supp. 865, 867 (E.D.Pa.1984), the insurer argued that an assault and battery exclusion in the defendant's comprehensive liability policy applied to preclude coverage for allegations that business was negligent in failing "to prevent or stop" the fight in

---

delivered to him not to me, it was delivered to his shop.

Q. He was well aware that was the purpose, did you ever check with him to make sure that this unit was designed to operate in this manner? Could be sued as a dump truck?

A. He went out and looked at it to the site [sic] and he made those arrangements before it was purchased.

Q. Okay, just one other thing, you never personally were involved at all in any of the reconstruction activity, all you did was tell them what you wanted done on it, is that correct?

A. Yes.

Q. You never did any of the physical labor, you never touched the unit in any way as far as reconstruction?

A. No. No I didn't do any of the labor.

Q. So all you did was tell them what you wanted, what you thought was the best say to do it and then you left everything to the Hosteller [sic] and to Pepper [sic]?

A. That's correct.

(Hanes statement, Nov. 6, 1989, p. 11. Record document no. 21, filed April 1, 1991, Exhibit "E". Emphasis supplied.)

Hanes' characterization of the manner in which the work was performed leads us to conclude as a matter of law that the modifications were made by independent contractors, since Hanes specified only the result he wanted but did not tell Peffer or Hostetler how to perform the work or act as supervisor. *Romanski v. Prudential Property & Casualty Insurance Co.,* 356 Pa.Super. 243, 514 A.2d 592, 595 (1986).

9. Jones alleges that Hanes:

18. ... was negligent, careless and reckless in caus[ing] the vehicle ... to be reconstructed or modified in a manner which rendered it unfit and unsafe ... and said vehicle had substantial design defects so as to render it inherently unsafe and said vehicle as modified posed serious risks to people using said vehicle.... [T]he defendant's negligence consisted of ... the following:

(a) *Having substantial modifications performed* either individually ... or by requesting an independent contractor to do so, on the vehicle in question *without consulting competent people to determine or otherwise insure that he design of the vehicle as modified, was capable of hauling loads and dumping loads as foreseeable without insult to the structural integrity of said vehicle;*

(b) Performed or had said modifications constructed in a negligent and careless fashion; specifically, the design of the modifications was defective and inherently unsafe for the unloading procedure for which said vehicle had been modified to perform and said design violated the basic safety regulations applicable to said work; and the bracket supports and other steel support were inadequate to perform their required tasks;

(c) Upon completion of the modifications, failed to inspect the work in question to check that the design was capable of performing the work intended and that the structural integrity of the vehicle was adequate and proper; and

(d) Failed to warn subsequent purchasers, users or consumers of said vehicle of the inherent design defects of the modified vehicle.

Jones complaint, para. 18. Record document no. 21, Exhibit "A". Emphasis supplied.

which a patron was injured, in failing to summon the police and in generally failing to "maintain order in and around the premises". *St. Paul, supra,* 582 F.Supp. at 867. The insured argued that the exclusion did not apply, since the injured patron was alleging that the insured was negligent in allowing the assault and battery to occur. The court rejected this argument, stating

> ... Dixon's argument that under some set of facts the claim would be reduced to one for negligent supervision does not obtain the desired result. A cause of action based upon negligent supervision is functionally indistinguishable from the claims of negligence found in Baylock's complaint. Liability based upon either theory will be barred by ... that portion of the clause excluding injuries occasioned by the failure to stop or prevent an assault and battery.

*St. Paul, supra,* 582 F.Supp. at 868.

*Sauter v. Ross Restaurants, Inc.,* No. 80–1202 (E.D.Pa. May 21, 1981) stands for the same proposition. Restaurant patrons were assaulted by defendant's "bouncer", and sued defendant in negligence for failing to supervise security personnel and for employing personnel with violent tendencies. The court held that an assault and battery exclusion precluded coverage. In so ruling, the court rejected defendant's argument that negligence, not assault and battery, caused the injury, stating:

> It is undoubtedly true that for plaintiffs to recover in this suit, they must demonstrate that their injuries were caused by the allegedly negligent acts. But, although the injuries must, in this sense, have been caused by Ross' negligent acts, it does not follow that these same did not 'aris[e] out of assault and battery.' Plaintiffs' real contention is that their injuries arose out of an assault and battery which, in its turn, arose out of Ross' negligence. Thus, plaintiffs' injuries are unambiguously excluded from coverage by the assault and battery exclusion.

*St. Paul, supra,* 582 F.Supp. at 867, quoting *Sauter, supra,* slip op. at 6. See also: *Terra Nova Insurance Co. v. Thee Kandy Store, Inc.,* 679 F.Supp. 476, 478 (E.D.Pa. 1988).

Jones' injury arose out of a claimed defect in the truck. Phrasing his claim against Hanes in part in terms of a failure to supervise does not alter that fact, nor does it negate application of the independent contractor exclusion.

Although the policy presents the exclusions in the disjunctive, such that if a single exclusion applies, coverage is negated, we will, in the interest of completeness, address the applicability of the second exclusion raised by the insurer.

### Products hazard exclusion

■ Products hazard coverage is intended to protect the manufacturer or seller of goods from claims for injury and damage arising out of the use of the insured's products. The risk which is being insured is that the product will not perform in the manner expected. If the product works as it is supposed to, but through other negligence the insured the insured's product causes injury or damage, there is no coverage. **Thus, where Products Hazard Coverage is excluded, the insurer is not responsible for the failure of the insured's products or goods to work as anticipated."**

*Harford, supra,* 578 A.2d at 496, quoting *Brewer v. Home Insurance Co.,* 147 Ariz. 427, 710 P.2d 1082, 1086 (1985).

Federal Kemper's policy excludes coverage for injuries arising out of completed operations and product hazard. It defines "products hazard" as encompassing claims for injuries arising:

> ... out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others.

The policy defines "named insured's products" as:

... goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, including any container thereof (other than a vehicle), but 'named insured's products' shall not include a vending machine, any property other than such container, rented to or located for use of others but not sold.

(Record document no. 21, Exhibit "C".) It does not define what constitutes "goods" or "products manufactured, sold, handled or distributed" in this context. The usual interpretation of those terms would encompass goods sold or distributed by the insured in the ordinary course of business, but not incidental sales of used equipment, office furniture and the like.

The issue before us is whether this exclusion applies to used equipment not sold in the ordinary course of business. *Pennsylvania National Mutual Casualty Insurance Company v. Kaminski Lumber Co.*, 397 Pa.Super. 484, 580 A.2d 401 (1990), is directly on point. Kaminski Lumber Co. ("Kaminski") had a comprehensive liability policy with Pennsylvania National Mutual Casualty Insurance Company ("Pennsylvania National"). When Kaminski was sued for negligent failure to warn by an individual, Danny Toney, injured while operating a used saw purchased by his employer, which had formerly belonged to Kaminski, Pennsylvania National denied any obligation to defend or indemnify Kaminski, relying on a policy products hazard exclusion in his policy. The trial court rejected Pennsylvania National's argument, finding, *inter alia*, that the policy language was ambiguous since the term "product" was not clearly defined and that the exclusion did not apply since the claims made against Kaminski were grounded in negligence, not products liability.

The Pennsylvania Superior Court affirmed for the following reasons: (1) policy language delimiting the exclusion was ambiguous in failing to define what constitutes a product under the terms of the policy; (2) this ambiguity requires strict construction of the exclusion against the insurer in a manner consistent with the reasonable expectations of the insured; (3) the insured would reasonably have expected the exclusion to apply only to lumber, his stock in trade; and (4) sale of a used saw did not fall within the confines of the exclusion as construed. See also: *Friestad v. Travelers Indemnity Company*, 260 Pa.Super. 178, 393 A.2d 1212 (1978).

The Superior Court's findings in *Kaminski* offer a parallel for resolving the issue before us. All of the pertinent facts are the same. Federal Kemper's policy does not define what constitutes "goods" or "products manufactured, sold, handled or distributed" by the insured, rendering that portion ambiguous and meaning that it must be construed in a manner favorable to the insured and consistent with his reasonable expectations in contracting for coverage. We find, as did the *Kaminski* court,[10] that an insured would reasonably expect a products hazard exclusion to apply only to items sold in the ordinary course of business, i.e. his stock-in-trade, and not to the sale of used equipment or other items which are not his stock in trade and are sold only on an incidental basis. Since it is undisputed that used equipment was not Hanes' stock-in-trade, the products hazard exclusion does not apply in this context.

### Completed operations exclusion

■ Completed operations coverage is a service company's equivalent of product hazard coverage. Companies in the business of providing services or performing contracts at premises other than their own, e.g. construction contractors or repair services, purchase such coverage to insure against liability arising from the services they perform for their customers. *United States Fidelity and Guaranty Company v. Greater Essex Security, Inc.*, 248 N.J.Super. 105, 590 A.2d 262, 266–67 (1991) and *Pacific Indemnity, supra*, 766 F.2d at 764. See also: "Liability Coverage for Toxic Hazardous Waste Disposal and Other Pollution Exposures", 25 Idaho L.Rev. 567 (1989).

10. See also: *Pacific Indemnity, supra*, 766 F.2d at 765.

Conversely, comprehensive policies which exclude such coverage do not insure against problems arising from work performed by the insured for a customer after completion of the work. The Federal Kemper policy excludes coverage for:

> ... operations or reliance on a representation or warranty made at any time with respect thereto ... if ... bodily injury ... occurs after such operations have been completed or abandoned and occurs away from the premises owned by or rented to the named insured ... [11]

Federal Kemper's policy does not define what "operations" performed by the insured fall within the confines of the exclusion. It does not specify whether the term "operations" includes only activities carried out by the insured in the normal course of business, e.g. services which the insured provides in the ordinary course of business, or whether its scope is broader. Because the provision is reasonably subject to more than one interpretation, it must be strictly construed in accordance with the reasonable expectations of the insured in contracting for coverage. Much the same rationale applies here as applied in construction of the products hazard exclusion. We find that an insured would reasonably expect a completed operation exclusion to apply only to services he provides or work he performs in the ordinary course of his business, and not to the modification of equipment done only on an incidental basis for purposes of rendering the equipment usable at his business. A more expansive interpretation would virtually negate coverage. The exclusion would swallow the policy if we were to construe "completed operations" as applying to any work performed by or at the request of the named insured. Since it is undisputed that Hanes was not in the business of modifying trucks or any other equipment, we find that the completed operations exclusion does not apply in this context.

---

**11.** The exclusion provision then goes on to explain the conditions governing its applicability, stating that the term "operations" includes "materials, parts or equipment furnished in connection therewith" and that operations are "deemed completed at the earliest of the following:

(1) when all operations to be performed by or on behalf of the named insured under the contract have been completed,

(2) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or

(3) when the portion of the work out of which the injury for damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.